May it please the Court, to be eligible for tax-exempt financing under Section 142A of Section 142M, the surface transportation project must be the project that actually received federal assistance under Title 23. The passenger railroad now before this Court is not the project that received federal assistance under Title 23 and is not eligible for financing with private activity bonds. It is undisputed that the projects that received federal assistance under Title 23 were projects that were funded under Section 130 of Title 23 to eliminate hazards at the highway railroad crossings of a pre-existing freight railroad. Even if an inference can be drawn that the passenger railroad will benefit from these projects, that doesn't make the passenger railroad the surface transportation project that actually received the federal funding. Merely benefiting from another surface transportation project that received federal assistance is insufficient under the plain language of the statute. In fact, the Secretary is eligible for financing with private activity bonds, but it did not do so. Congress sought to limit the universe of surface transportation projects eligible to be financed with the bonds to the specific type of projects that were authorized to receive federal assistance under a provision of Title 23 that was in place as of August 10, 2005, and that actually received federal assistance under such provision. To be the project that receives federal assistance under a provision of Title 23, the project must be the type of project funded under that provision. The passenger railroad project is not a project to reduce hazards at railway highway crossings and thus cannot rely on Section 130 funding to be a surface transportation project eligible for financing with private activity bonds. Both DOT and the District Court relied pretty heavily on a letter, which is to be found in the record at 4493-95, from the Federal Highway Administration to the Internal Revenue Service, dated October 7, 2005. That letter states that if a segment of a highway receives federal highway funding, then the entire highway is eligible for financing with private activity bonds. This is so, the letter argues, because a contrary view would force state grantees to, quote, sprinkle, unquote, Title 23 funds to every segment of the highway. But here, the Section 130 grant monies cannot be, quote, sprinkled, unquote, to every segment of the passenger railroad project. Obviously, 98% or more of the passenger railroad project has nothing whatsoever to do with improving the safety of railway highway crossings, and therefore, the vast majority of the passenger railroad project is not eligible for funding under Section 130. The Federal Highway Administration letter does not address the issue whether a surface transportation project that is different in kind from the type of project that may be funded under the relevant provision of Title 23 may be financed with private activity bonds. According to DOT, it does not matter whether the project to be financed with the bonds is the type of project authorized to receive federal monies under Title 23. It does not matter whether the project actually received federal monies under Title 23, and it doesn't matter even whether the federal grant monies were intended to benefit the that the surface transportation project may enjoy a, quote, benefit, unquote, from some other surface transportation project that has received federal assistance under Title 23. But in this context, the statutory phrase in Section 142M, quote, project which receives federal assistance, unquote, means, quote, project which receives federal funding, unquote. DOT's guidance document on 142M, which is published in the Federal Register, cited in our briefs, directs applicants seeking DOT approval under Section 142M to present evidence describing the, quote, Title 23 funding received by the project, unquote. The document directs the applicant to provide DOT with the, quote, amount of financial assistance, unquote, received, which clearly means the dollar amount of the funding, not an estimate of the benefit received. There is no logical reason why Congress, if it wanted to tie eligibility for private activity bond financing to Title 23 funding, would have said, well, a passenger railroad, in general, is not eligible for financing with these types of bonds. But if it is a pre-existing safety project, well, then it is. The passenger railroad, in both cases, is essentially the same project. Deference is not warranted under Chevron in this case. There is no indication that Congress delegated to the Secretary of Transportation the authority to, quote, speak with the force of law, unquote. And under United States v. Meade, therefore, under Chevron Step 0, as some commentators have said, this is not the type of legal issue that warrants deference under Chevron. In addition, there is really nothing in the record where DOT explained why it reached the conclusion that this project was even eligible for financing with private activity bonds. It did cite the Federal Highway Administration letter, but I have already discussed that, and that letter does not even address the issue that is now before the Court. The administrative record is devoid of any documents indicating that DOT even considered the issue of whether a project can be eligible for private activity bonds if it's not the type of project that is eligible to receive assistance under Title 23. So under your view, if part of a project receives Title 23 funds, is that enough, then, to qualify the project for a private activity bond financing? No, Your Honor. Although, let me qualify that by saying it does depend on the type of financing mechanism that's used. Here, the monies were for a Section 130 project, which is a project to eliminate hazards at a railway highway crossing. Those funds, even if spent for that type of project, even if it benefits a passenger railroad project, does not make the passenger railroad project eligible for financing with private activity bonds. I think there would be a different question if what was before the Court was the highway segment issue that was discussed in that Federal Highway Administration letter. There, at least the project to be financed with the bonds is the type of project eligible for funding. But that's not even the case here. Passenger railroads are not eligible for funding under Section 130. But you could just describe, it depends on how you describe the project. Because the passenger railroad project, obviously the passenger railroad project involves track that has to cross roads. And so, if you describe that project as one that encompasses all the passenger railroad projects successful, that project could be described in a way that includes improvements to crossings. Your Honor, the way the statutory language is drafted, our position is that the only projects that are eligible to be financed with private activity bonds are the specific types of projects that are described in a provision of Section, excuse me, in a provision of Title 23 that was in effect as of 2005. As applied to this case, the type of project that was funded is a project to eliminate hazards at a railway highway crossing. The fact that the passenger railroad may benefit from that project doesn't make the entire passenger railroad a project to eliminate hazards at a railway highway crossing. So the statutory language says it must be the project that received federal assistance under Title 23. And the passenger railroad is not even eligible for funding under Section 130. So it's not eligible for financing with private activity bonds. I want to touch briefly on the NEPA claim, starting with the issue of public safety. I've been litigating environmental cases for 30 years, and the typical reaction of a defendant when someone says, well, the project could kill someone or harm someone, they say, well, that's very speculative. We don't have to take a hard look at that. No one's making that argument here. No one is saying that this is a speculative harm. What was in the EIS is there's railroads on the corridor, now we're going to have more railroads on the corridor, so there's greater opportunities for conflict. That's at page 5-159 of the EIS, Joint Appendix 2397. So greater frequency was disclosed. What was not discussed, and certainly not taken a hard look at, is the dramatically increased speed of the new trains, as opposed to the existing freight trains rumbling up and down the corridor. The existing trains are 28.5 miles per hour. The new trains will be more than 100 miles per hour, or as we said in our brief, more than 150 feet per second. The safety risks associated with these much faster trains were not disclosed. There's no disclosure of an adverse impact, and there was no hard look at this adverse impact. And in this regard, I think it's important to consider the adequacy of the discussion by reference to 40 CFR 1502.15. That's a provision of the CEQ NEPA regs. What that provision says is that data and analysis in an EIS, quote, shall be commensurate with the importance of the impact, unquote. Which is a very common sense idea. If something is not that important, it doesn't deserve extensive discussion. If something is very important, as is the case here, because we're talking about life and death and fatalities, then the degree of analysis should be commensurate with the importance of that. And there's simply no hard look in the EIS. In fact, there was a disavowal in the EIS of any need to take a hard look on the ground that the pedestrians crossing between the crossings are trespassers, and on the ground that there'll be an analysis done later under the Part 270 regulations after the EIS process. Both of those rationales are now abandoned, essentially, by DOJ, because they have conceded that the hard look had to be in the EIS, not in the subsequent analysis. But there simply is no hard look in the EIS itself. There's no discussion of the much faster trains in this document. As to noise, I see I'm in my rebuttal time. We'll rest it on briefs. Thank you. Okay. Thank you. Any further questions from the panel? No? Thank you. May it please the Court, my name is John Pepin on behalf of the Department of Transportation. I'll be sharing my time with Mr. Stearns. The All Aboard Florida train line is bringing Are you dividing topics in any way? No. So the All Aboard Florida train line is bringing a new, environmentally beneficial transportation option to an extremely busy, congested travel corridor. And it's doing it predominantly with private funding. The principal question that the plaintiffs want to raise here is whether the state-issued bonds that were sold to private investors to finance this project qualify for a tax exemption that Congress created to encourage exactly this type of private investment in public infrastructure. But there is a threshold question that we have to reach first of whether Congress intended for local governments that oppose transportation projects to have a private right of action to challenge that tax exemption. And the answer is yes and no. There are statutes which protect the environmental and noise and safety interests they're raising, such as NEPA, and arguably Section 147F of the Internal Revenue Code, which requires state or local approval of such a bond issue. And they can bring a student under those statutes and nobody else. Is the issue here whether they can bring under the statute or under the APA? Under what? The APA. It would be, they would need a cause of action. Well, I mean, the APA provides... The APA is the cause of action. Of course, but you have to be within the zone of the interest assessment statute. That's a different question than whether there's a private right of action, right? Okay. Well, I meant to say whether they have a cause of action, which is how the Supreme Court has renamed what used to be called prudential standing. And they don't have a cause of action under Section 142M. Section 142M reflects a congressional judgment that certain types of infrastructure projects that private investors are willing to build are worthy of some federal assistance in the form of a tax exemption for the private bonds that are used to issue them. And, you know, to the extent that a locality disapproves of a project, they get to have their say through a NEPA challenge. They get to have their say, depending on, you know, the state gets to have their say, too. But Section 147 does provide them with an opportunity. But Section 142 simply does not include the sort of localized noise and safety interest that they're trying to raise. And how is that distinct from the Pottawatomie Indians case? Well, in that case, you're talking about the very hard to pronounce... Pottawatomie. Oh, okay. Yeah, I'm sorry. I was thinking, that is the same case. In that case, the Supreme Court has a regulation that specifically required consideration of conflicting land uses. And that is how a neighbor who argued that he had a disagreement with the land use came to be within the zone of interest. In this case, however, there is not. The plaintiffs have pointed to guidance for applications that says, you know, submit your environmental approvals. But that is not for a substantive environmental evaluation of the projects. It's really... This is a financing provision. And they want to know, is this project shovel-ready? Or are you planning to do something that's going to require so many approvals that you have no chance of getting? So all they want is evidence that the approvals have been obtained. It is not for a substantive environmental or safety review of whether... of the project. Because the question under 142M is not, is this project environmentally benign? That's a question we can raise in 142M is, is this an exempt facility? And the statute lays out the elements of what is an exempt facility. And that reflects Congress's judgment that certain sorts of infrastructure projects are worthy of Texas... How do you answer their point that this is not a project that's eligible under 130? They are reviving an argument that they made below and lost and didn't appeal. Below, they argued that any surface transportation project doesn't mean any surface transportation project. It means a highway. Because Title 23 is entitled highways and generally funds things that are highway-related. And the district court rejected that argument, and they didn't appeal that. And the district court rightly found that if Congress wanted to say any highway project, any project, you know, it could have used a lot of words other than any surface transportation project, which is extremely broad. But I thought their argument was not focused on the any surface transportation project part of the text, but it was focused on the next part, which is, which receives federal assistance under Title 23. Well, I think they're doing both. There's two arguments. First, they're saying that the project under 142M has to not just include, not just have components or portions that are funded under Title 23, but has to be exactly identical and coextensive with the project that received funding under 142M. So can I just take apart what you just said? So the first part of what you said has to not just include. What's the best indicia from your perspective of the fact, suppose I agree with you that it only has to include and it doesn't have to be coextensive with. What's the best indicia from your perspective that the project does include? Oh, well, a rail line includes railroad crossings. And, you know, one of the other issues we'll be arguing about if we get to the NEPA issues is the safety of these crossings. There's 350 some odd rail highway crossings on this line. And the state of Florida invested $9 million in upgrading 72 of them. That is a very substantial, with Title 23 dollars. So that is some very substantial Title 23 assistance to this project. But when you say it's very substantial assistance to this project, that's the part that just seems to be. Because the grade crossings are a necessary part of this project. Now, I'm not saying that 142M would only apply where it is a necessary part. It could be that they were just, you know, related and mutually beneficial. But in this case, you have that extra layer of relationship where you can't have a rail line without crossings. And you have to have the crossings need to be upgraded. And that's an essential part of this project. Everybody $9 million of Title 23 funds were invested in improving 72 of these crossings. So where would I look in the record for the, what you say, I'm not saying it doesn't have intuitive force, but where would we look in the materials to show that the grade crossings are improvements to the grade crossings that are done with Title 23 funds, at least in part, are an essential part of the passenger rail line? I would look at the FRA, Federal Railway Administration, safety engineering reports. And those are at 2604 to 2619. And what they did is they did a survey. This is the safety office of the Federal Railroad Administration. And they included the local government representatives. And they surveyed every grade crossing on the entire line, some 360 of them. And they required updating to the latest technology, which is, by the way, the sealed corridor approach it's called. And it's only actually applicable to high-speed rail lines. And this one doesn't quite qualify. So they went above and beyond in requiring an additional layer of safety here. Very impressive technological stuff that through technology can detect the presence of a train on the tracks and signal back to an approaching train, can control the traffic lights to make sure traffic can flow off the tracks. And then it includes some bricks and mortar stuff, like, you know, people will drive around these gates, believe it or not, when the train is approaching. And so what it does is it puts gates on both sides of the road so you can't drive around them. That's called four-quadrant gates, where they have these long concrete medians that go back 100 feet to, again, prevent people from driving around the gates. The other... Can my time really be that short? The other thing... Next time you should think about whether it's really worthwhile splitting your time, especially if you're not dividing into different topics. Okay. Well, I know that AAF has some things to say, and I don't want to use all their time. Perhaps I should ask them if you have any specific questions for me. All right. Thank you. May it please the Court, Gene Starnes for Baltimore, Florida. Since we didn't get to the NEPA issue, I think it will be your responsibility to answer the questions regarding NEPA. Yes, and when we look at the NEPA issues, we have to understand the record that exists here is unusual from the standpoint of a NEPA analysis. In developing this FEIS, obviously you went through a comment period that was extensive. Once the final environmental impact statement was prepared, the agency went through a second comment period, which is quite unusual in this process, and responded in the final record of decision with responses to all of those comments. The other side has narrowed its focus, perhaps not all of its complaints, to a claim that the speed of the train was not recognized with respect to its safety consequences. Is this categorically untrue? It's just not true. In fact, this relates back to the issue of the private activity bond funding, because the appellant here makes two mutually exclusive arguments, argues that the project does not include grade crossings, and then argues that the safety analysis, which spent two years on 356 grade crossings, which is critical to be able to operate a rail system that operates at these speeds. And if I may, Your Honor, in looking at this in context, I've always thought that if Eisenhower had come back after World War II liking trains instead of the autobahn, America would have been a different place, because trains are a more efficient way to move people than goods, and in this case, this right of way has existed since 1894. Can you say where in the EIS the discussion of the speed vis-a-vis safety was discussed? It's discussed in every intersection where speeds are addressed and the nature of the improvements that have to be made literally throughout the entire... Can you make a citation to the record? At my fingertips, I cannot, Your Honor. Okay, and after the argument, can you send us a letter referring to the places in the record where the relationship between speed and safety was discussed? They argue that it's not there. You argue that it's everywhere. There's only one way to resolve this question. You're correct, Your Honor. Point us to where it is. Well, if we're permitted, we'll file a statement showing all the points in the record... Please do it by the end of today. I'm sorry? Please do it by the end of today if you can. By the end of the day, it will be done. Thank you. Your Honor, in looking at the issues of safety, they're basically making two arguments. One is pedestrian safety, and the other is noise on the environmental impact statement. On pedestrian safety, they have, in fact, misstated the record. Pedestrian safety falls into two categories. One is the intersection of grade crossings in the rail system, which was extensively analyzed by the agency, the Federal Railroad Agency Administration. And, in fact, all of those grade crossings were determined to have to be improved dramatically at every single grade crossing to a higher standard than would otherwise be necessary. Can I just interrupt for one second? The 72 or so grade crossings that were provided with respect to the Title 23 money? Yes, Your Honor. Was that part of this? Are those the crossings you're talking about, or those were all done before? Your Honor, those were done in connection with the planning for this process. That is to say, you had a company that had two subsidiaries. One was a freight subsidiary. One was a passenger subsidiary. They entered into a written agreement, which is called a joint use agreement, where the passenger facility is undertaking the complete improvement to current highest standards of a rail system in the United States of America in order to restore passenger service on this right-of-way. So just to be clear, then, the Title 23 funds were used as part of what you just described  Absolutely. Now, sorry again. Could you include the citations in the record that established that point? Well, that I can tell you. You're going to find it at JA4536, which is the application which identifies, and in connection with that, it's actually attached to the government's brief, is the listing of all 72 of the intersections where the Title 23 money was invested. But I keep in mind, Your Honor, respectfully, is that when you have an F-grade system, this is not D.C. We have a water table that's very low or very high relative to land level. You can't do separated grades like I drive around D.C. Stan, this is a much more simple question. All I'm asking is for record citations that indicate that the 47, I'm sorry, the 72 were in contemplation of the rail project that we now have in front of us. What you have is the application, which I gave you the citation to the application. Right. You have the identification, which is independent to the application, which is attached to the government's brief, and you have the Federal Railway Administration that reviewed the application and determined, in fact, the grade separation, the non-grade separations where you had F-grade intersections were part of the overall project, which is a multibillion-dollar project of which this grade crossings is an important element. Safety at grades is an important element, but it's not the entire project. And so what you have is that Congress authorized private activity bonds to incentivize private investment. And I point out, Your Honor, that this is the first privately invested rail system in the United States of America in over 100 years, and it's because a relatively small investment of U.S. taxpayer dollars, not invested directly but deferred, will allow the investment of billions of dollars to establish a rail corridor connecting four of the most populous communities in the state of Florida. Thirty-six percent of the population of the state of Florida will now be connected by rail. From Miami to Fort Lauderdale to Palm Beach to Orlando, and the plan, of course, is to move to Tampa. And the importance of this project from an environmental standpoint is taking, you know, in excess of a million people off roads. Can I ask you one more question? Yes, Your Honor. I'm sorry. I'm sorry to be beating a dead horse. I want to be sure I'm right about this. The government's Supplemental Addendum 14, this list of the projects from 2005 to 2014, did you say this was also an addendum to the application? It was part of the application, Your Honor. And what you're left with is that the project is not just a track. It's not just a station. It's not just – it is every element of the project, including grade crossings. And therefore, what the statute permits is private activity bonds, which – where the project is supported by Title 23 funding. So, further questions from the bench? Thank you. Thank you, Your Honor. We'll hear again from Petitioner. Thank you, Your Honor. Well, you just heard two essentially inconsistent approaches from DOJ counsel and from private counsel. DOJ counsel said that the evidence tying the Section 130 projects to the passenger railroad project were the FRA safety engineering reports. The FRA safety engineering reports are appendices to the FEIS. They can be found at 2604. That's the first one. And the second one begins at 26 – I'm sorry, the first one is at – they're around J.A. 2604. They're appendices to the FEIS. These engineering reports were done in 2014. There is absolutely nothing in the record to indicate that any of the safety recommendations in these FRA engineering reports have anything whatsoever to do with the safety projects that were funded by the – by DOT from 2009 to 2014. There's nothing whatsoever in the record to support the nexus between the FRA safety evaluation and the safety projects. Can you tell me – do you have standing? Yes, Your Honor. And how do you locate it? The – we are bringing this action under the Administrative Procedure Act. Okay. That doesn't answer the standing question. In terms of Article III standing? Yeah. Yes. We litigated Article III standing quite extensively in the district court in the earlier litigation. Just remind me. Judge Cooper held we did have Article III standing, and that was not challenged in this case. It doesn't matter. Okay. Well, we've alleged and proven through affidavits many harms to Indian River County, and we've also – Many harms of what? The harms that we are relying on include accidents that are going to require the emergency services district to respond. There's delays to county vehicles that from the progress of the trains and the closure of roads that will be closed while the trains travel through the county. We've also provided affidavits as to – And what is the remedy that you seek – forgetting the EIS part of it – What is the remedy that you seek that addresses those alleged injuries? Well, the remedy we seek – Where are you pulling it from? Are you pulling it from 130 or M? The remedy we seek, Your Honor, is vacateur of the approval of the bonds. And what we demonstrated in the district court is that if the bonds cannot be floated or cannot be used to finance this project, then the project will not be able to go forward. And then that would redress the injuries that we've alleged and proven from the project. It would redress them. Right. So we have injury in fact. We have causation between the government approval we're challenging and – I mean, are you saying that there's no possibility of a bond issue – the PAB's issue? You're saying you can nullify – allegedly nullify the PAB's at work, and – all right, let's assume that happens, then what? Can they never issue? And if they cannot, why not? What is your theory? Well – Is the redress – are you seeking redress to simply kill this? There should be no possibility of this ever happening, or are you saying it can happen but it has to happen in a different way, and here's what would be required? I'm not – I just don't really understand what you're arguing. I think the answer to Your Honor's question is a little different under Section 142 and under the EIS. Under NEPA, our complaint is they didn't take a hard look – Forget the NEPA. Forget the – okay. I understand. On Section 142, what we're saying is that this project is not a surface transportation project, which has received funding under Title 23, and therefore it's not eligible to be financed with private activity bonds. And if this Court agrees, it would nullify DOT's contrary determination. The effect of that, as I understand it from the bond offering document that we cited in our reply memo – reply brief, is that there would be an extraordinary mandatory redemption of the bonds that have been issued, and the monies essentially would be refunded to the investors. Now, you never challenged the 130 issuance. You have an argument to be made that the county has an opportunity to object, right? That's not an issue here. No, we have been consistently challenging the eligibility of this project for private activity bond financing. I understand, but that's under M. M – 142M and 130 are connected. You don't have a 142M unless you have a 130, right? And you have some rights under Warden 30, as I understand it. You have not tried to preserve it – preserve them, as I understand it. We have consistently argued throughout every phase of this litigation that there is nothing whatsoever in the record that the projects that were funded from 2019 and 2014 have anything whatsoever to do with this project. That's been a consistent position we've taken throughout. This issue is certainly preserved for this appeal. Because you're essentially saying the assistance has to be coterminous with respect to 130 and the 142, right? What we're saying is that the only type of project eligible for private activity bond financing are the types of projects that are described in one of the sections of Title 23 that was in effect as of 2005. The only section relied upon in this case is Section 130, which provides for a mechanism by which DOT can pay to improve safety at railway harbor crossings. So those projects and only those projects could potentially be eligible for financing with private activity bonds. The passenger railroad project is not – Your assumption is correct. That is that the project has to be coterminous with the work that's being directly funded under 130. Well, it at least has to be the same type of project. You can't take a project that has nothing to do with railway harbor crossings and say, well, because we enjoy a benefit from that type of project, then our passenger railroad project should be able to be financed with private activity bonds. Merely enjoying a benefit from a surface transportation project, which receives federal funds, doesn't make the other surface transportation project that enjoys that benefit the recipient of those funds. So your argument is there can be no PABs. It doesn't matter about the EIS or anything else. There can – in these circumstances, you're saying, there can be no private bonds. Well, certainly on the record before the court, they can't be – Well, no, you tell me your position because I'm trying to understand injury redress. What are you arguing? You're saying it cannot happen. These circumstances cannot produce the private activity bonds of the sort that are given. They can't happen. As a matter of law, they cannot happen is your argument. Absolutely. Section – Yes, so the bottom line is just yes, right? Your argument is if you win, there will be no federal guarantee here or whatever else is required, and the project will crash. And therefore, there will not be high-speed trains in that area, right? And therefore, you won't be injured. Yes. That's your claim on this. And if you lose this, then you have a separate claim on the EIS, and that's a different kind of standard. Yes. Okay. Okay. No questions. Thank you. We'll take the matter under submission. Thank you.
judges: Garland, Srinivasan, Edwards